STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

16-107

STATE OF LOUISIANA

VERSUS

TEDRICK JEWAN RICHARDSON

**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 313-913
HONORABLE MARY L. DOGGETT, DISTRICT JUDGE

**********

**MARC T. AMY**
**JUDGE**

**********

Court composed of Sylvia R. Cooks, John D. Saunders, and Marc T. Amy, Judges.

**AFFIRMED WITH INSTRUCTIONS.**

**Cooks, J., dissents and assigns written reasons.**

**J. Phillip Terrell**
**District Attorney**
**Michael W. Shannon**
**Assistant District Attorney**
**Post Office Drawer 1472**
**Alexandria, LA   71309**
**(318) 473-6650**
**COUNSEL FOR APPELLEE:**
        **State of Louisiana**

**Chad M. Ikerd**
**Louisiana Appellate Project**
**Post Office Box 2125**
**Lafayette, LA   70502**
**(225) 806-2930**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Tedrick Jewan Richardson**

**AMY, Judge.**

The State alleged that the defendant was involved in a series of drive-by shootings that resulted in the death of one of the victims. A jury convicted the defendant of one count of negligent homicide, two counts of attempted second degree murder, and one count of felon in possession of a firearm. After finding the defendant to be a second felony habitual offender, the trial court sentenced the defendant to ten years without the benefit of probation or suspension of sentence for the negligent homicide conviction; twenty-five years without benefit of probation or suspension of sentence for each conviction for attempted second degree murder, and fifteen years without the benefit of probation or suspension of sentence for the felon in possession of a firearm conviction. The trial court ordered that the defendant's sentences for negligent homicide and attempted second degree murder run consecutively and that the defendant's sentence for felon in possession of a firearm run concurrently with the other sentences. The defendant appeals. For the following reasons, we affirm with instructions.

**Factual and Procedural Background**

According to the record, in the late night/early morning hours of September 27-28, 2011, there was a series of drive-by shootings in Alexandria. One of those shootings resulted in the death of Joe Marzette and another resulted in a gunshot wound to the leg of Darryl White.[1] Thereafter, the defendant, Tedrick Jewan Richardson, was charged with one count of second degree murder, a violation of La.R.S. 14:30.1; two counts of attempted second degree murder, violations of La.R.S. 14:30.1 and 14:27; one count of possession of a firearm by a convicted

---

[1] The record contains several inconsistencies in the spelling of the names of various parties. Unless otherwise noted, we use the spellings contained in the transcript of the trial.

felon, a violation of La.R.S. 14:95.1; one count of distribution of a counterfeit controlled dangerous substance—Schedule II, a violation of La.R.S. 40:967(A)(2); and unauthorized use of a motor vehicle, a violation of La.R.S. 14:68.4. After a trial, the jury returned a responsive verdict of guilty of negligent homicide, a violation of La.R.S. 14:32; guilty with regard to both counts of attempted second degree murder; guilty of distribution of a controlled dangerous substance— Schedule II; and not guilty of unauthorized use of a motor vehicle.

The record indicates that defendant filed a motion for post-verdict judgment of acquittal and that the trial court granted that motion in part with regard to the defendant's conviction for distribution of a controlled dangerous substance— Schedule II. Further, the State filed a habitual offender bill, and the trial court determined that the defendant was a second felony offender.

The trial court sentenced the defendant to ten years at hard labor without benefit of probation or suspension of sentence for his conviction for negligent homicide and twenty-five years at hard labor without benefit of probation or suspension of sentence for each of the defendant's convictions for attempted second degree murder. For his conviction for possession of a firearm by a convicted felon, the trial court ordered that the defendant serve fifteen years at hard labor without the benefit of probation or suspension of sentence. The trial court ordered that the defendant's sentences for negligent homicide and for each conviction of attempted second degree murder run consecutively. It further ordered that his sentence for possession of a firearm by a convicted felon run concurrently with his other sentences.

The defendant appeals, asserting as error that:

2

I.      The Trial Court Erred in Denying Tedrick Richardson's Post-Trial Motions Because there was Insufficient Evidence that he was Involved in Any of the Three Shootings.

II.      Even if Tedrick Richardson's statement is Accepted as True, Nothing in His Statement or Witness Testimony Establishes that he acted as a Principal or the Actual Perpetrator of Any of the Three Shootings.

III.      The Trial Court's Imposition of Consecutive Sentences for the Three Shootings was Excessive.

## Discussion

*Errors Patent*

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent. An error patent is one which is "discoverable by a mere inspection of the pleadings and proceedings and without inspection of the evidence." La.Code Crim.P. art. 920(2). On review, we note patent errors with regard to the sentences reflected in the minutes and commitment order. Namely, the trial court's minutes from the defendant's sentencing hearing indicates that the defendant's sentences for negligent homicide, attempted second degree murder, and possession of a firearm by a convicted felon were imposed without the benefit of parole. However, the transcript of the hearing from the defendant's sentencing indicates that the trial court imposed "all sentences … at Hard Labor with no benefit of Probation or Suspension of Sentence[.]" It is well-settled that when the minutes and the transcript conflict, it is the transcript which prevails. *State v. Wommack*, 00-137 (La.App. 3 Cir. 6/7/00), 770 So.2d 365, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62. Accordingly, we instruct the trial court to correct the sentencing

3

minutes to accurately reflect the transcript and to further correct the commitment order to reflect that these sentences were imposed as stated in the transcript.[2]

*Sufficiency of the Evidence*

Although phrased differently, the defendant's first two assignments of error concern the sufficiency of the evidence. In addition to his assertion that the State presented insufficient evidence of his identity as one of the perpetrators, he suggests that consideration of the State's evidence is undermined by its reliance on circumstantial evidence.

The standard of appellate review for sufficiency of the evidence claims is well-settled. In *State v. Macon*, 06-481, pp. 7-8 (La. 6/1/07), 957 So.2d 1280, 1285-86, the supreme court reiterated that standard, stating:

> The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Mussall*, 523 So.2d 1305 (La.1988). A determination of the weight of evidence is a question of fact, resting solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witnesses. *State v. Silman*, 95-0154 (La.11/27/95), 663 So.2d 27, 35. A reviewing court may impinge on the factfinding function of the jury only to the extent necessary to assure the *Jackson* standard of review. *State v. Bordenave*, 95-2328 (La.4/26/96), 678 So.2d 19, 20. It is not the function of an appellate court to assess credibility or re-weigh the evidence. *Id.*

As here, the primary issue at trial in *Macon* was whether the defendant was one of the perpetrators in the subject series of offenses. "[W]hen the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification." *State v. Hughes*, 05-992, p. 5 (La. 11/29/06), 943 So.2d 1047,

---

[2] The commitment order presently provides that: "Defendant is given 60 years without benefit of probation, parole, or suspension of sentence."

4

1051.  In order to support a conviction, the defendant need only be positively identified by one witness.  *Id.*

Here, the parties dispute whether the State's case involved purely circumstantial evidence, or whether it relied upon a combination of direct and circumstantial evidence, or whether it relied upon a combination of direct and circumstantial evidence to prove the defendant's involvement.  "Generally, direct evidence consists of testimony from a witness who actually saw or heard an occurrence, proof of the existence of which is at issue[.]"  *State v. Lilly*, 468 So.2d 1154, 1158 (La.1985).  Circumstantial evidence, however, "consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience."  *Id.*

In *State v. Major*, 03-03522, p. 6 (La. 12/1/04), 888  So.2d 798, 801-02, the supreme court explained that:

> when the conviction is based on circumstantial evidence, La. R.S. 15:438 sets forth the rule that "assuming every fact to be proved that the evidence tends to prove, in order to convict, [the circumstantial evidence] must exclude every reasonable hypothesis of innocence." However, La. R.S. 15:438 does not establish a stricter standard of review than the more general rational juror's reasonable doubt formula;  rather it serves as a helpful evidentiary guide for jurors when evaluating circumstantial evidence. *State v. Toups*, 01-1875, p. 3 (La.10/15/02), 833 So.2d 910, 912; *State v. Chism*, 436 So.2d 464, 470 (La.1983).   When evaluating circumstantial evidence, the trier of fact must consider
>
>> the circumstantial evidence in light of the direct evidence, and vice versa, [and] the trier of fact must decide what reasonable inferences may be drawn from the circumstantial evidence, the manner in which competing inferences should be resolved, reconciled or compromised;  and the weight and effect to be given to each permissible inference.   From facts found from direct evidence and inferred from circumstantial evidence, the trier of fact should proceed, keeping in mind the relative strength and weakness of each inference and finding, to decide the ultimate question of whether this body of preliminary facts excludes every reasonable hypothesis of innocence.

*Chism*, 436 So.2d at 469.

With regard to the defendant's conviction for negligent homicide, La.R.S. 14:32 provides, in relevant part, that "A. Negligent homicide is . . . . (1) The killing of a human being by criminal negligence." Criminal negligence is defined in La.R.S. 14:12, which states that:

> Criminal negligence exists when, although neither specific nor general criminal intent is present, there is such disregard of the interest of others that the offender's conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful man under like circumstances.

With regard to the defendant's convictions for attempted second degree murder, La.R.S. 14:30.1 provides, in relevant part, that "[s]econd degree murder is the killing of a human being: (1) When the offender has a specific intent to kill or to inflict great bodily harm[.]" Further, attempt is defined in La.R.S. 14:27(A), which provides that:

> Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.

Thus, although La.R.S. 14:30.1 provides that second degree murder requires "specific intent to kill" *or* "to inflict great bodily harm," in order to be convicted of attempted second degree murder, the State must prove that the defendant had the specific intent to kill. *State of Thomas*, 10-269 (La.App. 3 Cir. 10/6/10), 48 So.3d 1210, *writ denied*, 10-2527 (La. 4/1/11), 60 So.3d 1248, *cert. denied*, _ U.S. _, 132 S.Ct. 196 (2011). However, that intent may be inferred from the specific circumstances of the offense and the defendant's conduct. *Id.*

With regard to the defendant's conviction for possession of a firearm by a convicted felon, La.R.S. 14:95.1 (footnote omitted) provides that:

6

A. It is unlawful for any person who has been convicted of a crime of violence as defined in R.S. 14:2(B) which is a felony or simple burglary, burglary of a pharmacy, burglary of an inhabited dwelling, unauthorized entry of an inhabited dwelling, felony illegal use of weapons or dangerous instrumentalities, manufacture or possession of a delayed action incendiary device, manufacture or possession of a bomb, or possession of a firearm while in the possession of or during the sale or distribution of a controlled dangerous substance, or any violation of the Uniform Controlled Dangerous Substances Law which is a felony, or any crime which is defined as a sex offense in R.S. 15:541, or any crime defined as an attempt to commit one of the above-enumerated offenses under the laws of this state, or who has been convicted under the laws of any other state or of the United States or of any foreign government or country of a crime which, if committed in this state, would be one of the above-enumerated crimes, to possess a firearm or carry a concealed weapon.

. . . .

C. The provisions of this Section prohibiting the possession of firearms and carrying concealed weapons by persons who have been convicted of certain felonies shall not apply to any person who has not been convicted of any felony for a period of ten years from the date of completion of sentence, probation, parole, or suspension of sentence.

Therefore, the State must have proven that 1) the defendant possessed a firearm; 2) a previous conviction for an enumerated felony; 3) the ten-year cleansing period has not passed; and 4) the general intent to commit the crime. *State v. Caffery*, 08-717 (La.App. 5 Cir. 5/12/09), 15 So.3d 198, *writ denied*, 09-1305 (La. 2/5/10), 27 So.3d 297.

With consideration of the elements of the offenses charged, and in light of the standard of review, we turn to consideration of the evidence presented at trial. State's witness Chris Newell testified that, on September 27, 2011, he visited Alexandria to buy crack cocaine. Mr. Newell explained that he ultimately loaned his car until "about twelve or one o'clock or so" to someone named "Dedrick, Tedrick – something to that [e]ffect" for about $50 worth of crack cocaine. Mr. Newell identified the defendant as the person to whom he had loaned his vehicle.

7

He explained that, when his car was not returned to him later, he flagged down a police officer. Mr. Newell testified that his vehicle was a 1997 Honda Accord, silver or gray in color, and that it had a sunroof and a small spoiler. Although Mr. Newell initially testified that he thought his back windows were tinted, after looking at a picture of the vehicle presented by the State, he admitted that they did not appear to be tinted.

Addressing the timeframe of the events at issue, an employee of the Rapides Parish Communication District testified that, on September 28, 2011, at 12:24 a.m., the 9-1-1 center received a call from Mary Street reporting that someone had been shot (the Monroe incident). Additionally, at approximately 12:44 a.m., the 9-1-1 center received a call from the vicinity of Cabrini school and Texas Avenue that there was an unresponsive person lying in the street (the Texas Avenue incident).[3] Finally, at approximately 12:49 a.m., the 9-1-1 center received a "shots fired" call from Merrian Peterson on Ninth Street (the Ninth Street incident).

With regard to the Texas Avenue incident, Debra Howard testified that she was driving on Texas Avenue on September 28, at approximately 12:30 a.m. when she noticed a man lying on the side of the street near the curb. Ms. Howard testified that she thought that the man had been drinking and had fallen from his bicycle. Ms. Howard, thereafter, decided to go back and see if the man was still lying there. When she returned approximately five minutes later and found the man still in the street, she asked her girlfriend to call 9-1-1. The record indicates that the body of Joe Marzette was subsequently located on Texas Avenue. The

---

[3] While the Texas Avenue incident was the second reported, the State asserted that it occurred prior to both the Monroe Street and Ninth Street incidents.

forensic pathologist testified that Mr. Marzette died from a gunshot wound and that he had recovered a small caliber projectile from Mr. Marzette's lung.

Although the 9-1-1 call regarding Mr. Marzette's shooting was made at 12:44 a.m. on September 28, the State introduced the testimony of Jamarques Starling. Mr. Starling testified that in 2011 he lived on Texas Avenue across the street from Cabrini school. According to Mr. Starling, at about 11:30 to 11:45 p.m. on September 27, 2011, he heard what sounded like a BB gun being fired. Thereafter, he saw a car coming down the street from the direction of the noise. Mr. Starling testified that the car had four doors and was "probably a Buick, something old school." Mr. Starling also stated that the car was dark black or blue, although he admitted that in his original statement he described it as light blue or gray. Mr. Starling also testified that the car had a least three passengers, and that the defendant was definitely not the driver of the car.

The State also offered the testimony of Lieutenant William Bates with the Alexandria Police Department. Lieutenant Bates testified that it was 2.4 miles from the location where Mr. Marzette was shot to the location of the Monroe Street incident, the alleged second-occurring shooting. Lieutenant Bates testified that, driving the speed limit, it took him seven minutes to drive from one location to the other.

As for the latter location, Darryl White testified that he was walking on Monroe Street after midnight on September 28, when he was shot in the ankle. According to Mr. White's testimony, someone fired at least six shots at him from the driver's seat of a car that was "standing still" around the intersection of Florence and Monroe. Mr. White testified that he saw the car before the shots were fired and that "the car was coming towards my way and they made the

corner." Further, "[w]hen they made the corner, they stopped in the driveway. Then they back backed [sic] to the corner and they started shooting at me."

Mr. White testified that there were at least four people in the car, which he said was gray, "looked like a gray Ford Escort[,]" and that it had tinted windows, although the tint was partially torn off one of the windows. Although Mr. White stated that the car had a spoiler on the back, he was certain that he car did not have a sunroof and that the windows were tinted. Further, Mr. White testified that the driver of the vehicle—the one who fired the shots—was "chubby" and "way, way bigger" than the defendant.

As far as the alleged third-occurring shooting that evening, the Ninth Street incident, Merrian Peterson testified that he was standing outside on Ninth Street when he saw "a car going from one side of the street to the other. . . . after that car passed me about four or five car lengths . . . someone got out and they cursing me out and the next thing I knew some bullets are flying by my head." Mr. Peterson testified that it was the passenger who stepped from the car. Mr. Peterson further explained that he dove behind his car and stayed there until the other car drove off. After taking about ten minutes to compose himself, Mr. Peterson called the police.

Mr. Peterson admitted that he originally described the vehicle as a dark blue Nissan with tinted windows. However, in his testimony he stated several times that he was not positive about the color of the car because it was "in the shadows" and that he had been drinking at the time.

As far as the defendant's alleged involvement, Sergeant Robert Distafano with the Alexandria Police Department testified that he began interviewing the defendant at approximately 8:30 p.m. on September 28, 2011, but that Sergeant

Cedric Green took over the interview about an hour later. According to Sergeant Distafano, the defendant was picked up shortly before the interview.

The defendant's recorded statement was played for the jury and, additionally, the transcribed statement was introduced into evidence. Therein, the defendant admitted that he gave Chris Newell drugs in exchange for the use of his vehicle. Further, the defendant stated that he and Quantavious "Taye" Frazier picked up Michael Dotson. The defendant claimed that the incident on Monroe Street was the first incident, and stated:

> A: Okay we rode. . .uh at first I was the driver. And then Mike forced like made me like make him drive. Like let him drive. While he was driving we went down Chester Street at first. And then we made it to Monroe Street. We made a right on Monroe Street. We rode down. And while I was in the passenger seat we made a couple of shots. My homeboy Taye was in the backseat.
>
> Q: Okay. He—who made a couple of shots?
>
> A: Mike. Mike shot a couple of shots, about two or three shots.

According to the defendant, Mr. Dotson was in the driver's seat at that time. The defendant stated that he had "never seen" the person that Mr. Dotson shot at on Monroe Street.

The transcript of the defendant's statement indicates that the officers next asked him about what happened on "Sixth Street." The defendant stated that:

> A: We made it off the highway, off 49 on the exit to Lower Third. We passed up Peabody. Alright we passed up Ed Payne's store and we made a right on Sixth Street. When we made a right on Sixth Street and made it to the fork, to the fork in the road. Alright then. . .then Mike was like hold on, hold on, hold on before we made it down the street.
>
> Q: Okay who was driving at that point.
>
> A: I was driving.

11

According to the defendant's statement, Mr. Dotson "jumped out" and "walked like up—like in front of the car a lil' bit." The defendant claimed that at that point he noticed that Mr. Dotson had a gun. However, the defendant also stated that "well, I already knew he had a gun cause he had shot[.]" The defendant stated that once he noticed Mr. Dotson had a gun, he "smashed the gas" and made a right. According to the defendant he heard a couple of shots after Mr. Dotson got out of the car. The defendant also stated that Mr. Frazier felt that the defendant's driving was going to get them "busted," so he and Mr. Frazier switched seats. Mr. Frazier "made the block and picked Mike up." The defendant later asserted that Mr. Dotson lived "right there" and that he thought Mr. Dotson was "fixing to run in [his] house and run back out." Further, he stated that Mr. Dotson told the defendant to "make the block."

With regard to the shooting on Texas Avenue, the defendant stated that he was sitting in the backseat and that Mr. Dotson was driving. The defendant stated that he had been "like laying like on – like the headrest like this[.]" The statement further indicates that:

> A:    with my hand to my head. And I just noticed Mike upping the gun out the sunroof. That's what made me like. . .really come to my senses; cause I had been smoking weed. When I seen that I looked, I like tried to look to see who he was aiming the gun at, and I ain't see nobody.
>
> Q:    Right.
>
> A:    Then I heard like three shots. Well I seen him shoot like three times you know[.] He hurried up and smashed off.

The defendant claimed that after that, they all went to McDonald's and then, when the defendant asked Mr. Dotson what they were going to do with the car, Mr.

Dotson said that he had "a spot to take it" on "Eight Street on a dead end street[.]" According to the defendant, they left the car there and then he went home.

The defendant also stated that between the incidents on Monroe Street and Texas Avenue, he went home and picked up a charger for his phone. The defendant claimed that the first shooting happened at "9-8-8:30-8:45-9[.]" When asked about the time period "from the first shooting to the last shooting[,]" the defendant responded "[a]bout three hours." He subsequently stated that: "Three or four hours at most. Cause we like Mike what is you doing man. Drop us off. Man y'all ain't going no where. Y'all go tell. Y'all boys must go tell. That's what he kept on saying, y'all go tell man."

Defense counsel questioned Sergeant Distafano, Sergeant Green, and Detective David Foshee about the course of the investigation. Specifically, defense counsel questioned both Sergeant Distafano and Sergeant Green with regard to their conduct during the defendant's interview and with regard to several people whose names were mentioned as part of the investigation, and whether the police interviewed those individuals or took their statements. With regard to Mr. Dotson, whom the defendant alleged fired the gun, Sergeant Distafano testified that he interviewed Mr. Dotson and that Mr. Dotson provided him with an alibi that he believed.

Additionally, Daniel Guillot testified that he saw the defendant several times on the night of September 27, 2011. According to Mr. Guillot, after 1 a.m. on September 28, 2011, he saw the defendant at a house belonging to Sirderian Caesar's aunt on Sixth Street and Glen Oaks. Mr. Guillot testified that when he first saw the defendant, he was wearing "a beat up small T-shirt" and was "sweaty like he had just been doing something." Further, Mr. Guillot testified that the

defendant had a "black and silver" handgun on his back belt loop, which he later testified was a 9mm semi-automatic. According to Mr. Guillot, the defendant went into a bedroom and changed clothes. Mr. Guillot stated that after the defendant changed clothes he did not see the gun anymore and that the defendant stayed at the house about thirty minutes. Mr. Guillot also observed that the defendant's grandmother lived across the street from the house.

Mr. Guillot further testified as to statements allegedly made by the defendant when they were both in a holding cell. According to Mr. Guillot, the next day both he and the defendant were picked up by the police, and the defendant was later placed in a holding cell with Mr. Guillot. Mr. Guillot explained that he overheard the defendant tell another person that "[he] busted somebody but they ain't got nothing on me." Mr. Guillot stated that he got to the holding cell at about 8:30 or 9:00 and that it was still daylight outside. According to Mr. Guillot, the defendant was put in the holding cell about thirty or forty minutes after Mr. Guillot's arrival.

The State also offered the testimony of FBI Special Agent William Williams. Agent Williams is part of the FBI's Cellular Analysis Survey Team and was accepted as an expert in the field of historical cell site analysis. According to Agent Williams, whenever a cell phone user makes a network transaction, such as a phone call or text message, the cell phone company records both the time of the transaction and the location of the cell phone tower used for the transaction. Agent Williams testified that, using this historical data, it is possible to "generally locate" where a cell phone was whenever a transaction was made. However, he cautioned that it was "impossible" to pinpoint a location where the phone was at the time of any particular transaction.

Agent Williams testified that he was asked to examine the defendant's cell phone records for September 27, 2011, from 11:45 p.m. to 12:02 a.m.; September 28, 2011 at approximately 12:23 a.m.; and September 28, 2011, at approximately 12:53 a.m. With regard to the transactions made in close proximity to Mr. Marzette's murder, Agent Williams testified that the defendant's phone made several transactions at between 11:44 p.m. and 11:47 p.m. using the western-facing side of a tower located at Willow Glen and Third Street. Between 11:48 p.m. and 11:49 p.m., the defendant's phone made several transactions using the southeastern-facing side of a tower located near Masonic Drive and Warshauer. Between 11:49 p.m. and 11:50 p.m., the defendant's phone made two transactions using the northeastern-facing side of a tower near Lee Street and Government Street. Agent Williams further testified that between 11:51 p.m. and 11:54 p.m., the defendant's phone made several transactions using the southeastern-facing side of the Masonic-Warshauer tower. At 11:55 p.m., the defendant's phone made a transaction using the southwestern-facing side of that tower. Agent Williams reiterated that he could "only tell you the general location of that phone when a call actually occurred[,]" and that he could not say where the phone was outside of any particular call.

The State offered into evidence several maps created by Agent Williams. Those maps indicated the coverage area boundaries of several tower sectors that Agent Williams identified as being used by the defendant's phone. Agent Williams noted the distance between the Government-Lee tower and the Masonic-Warshauer tower is "less than two miles[.]" Further, Agent Williams observed that Mr. Marzette's body was found "roughly half a block" outside of the coverage area of the tower sector used by the defendant's phone at 11:55 p.m.

When questioned by defense counsel, Agent Williams agreed that, if Mr. Marzette's murder occurred between 11:30 and 11:45 p.m., as opposed to 11:45 p.m. to 12:02 a.m., he had no data for that time period. Agent Williams also agreed that in order for the phone's general location to be recorded, there had to be some kind of transaction, such as a phone call or attempted phone call. Agent Williams testified that "[i]f a phone is just sitting idle somewhere, it's not going to record a location."

With regard to the transactions made in close proximity to the Monroe Street incident, Agent Williams testified that the closest time to the shooting per the Alexandria police was 12:23 a.m. Agent Williams testified that the defendant's phone recorded several transactions at 12:21 a.m. and 12:24 a.m., using the western-facing side of a tower near the intersection of Ninth Street and Murray. Agent Williams also created a map indicating the coverage area boundaries for the Ninth Street-Murray tower. Agent Williams testified that it was "approximately … ten blocks" from the tower to the location where shots were fired at Mr. White.

With regard to the transactions made in close proximity to the Ninth Street incident, Agent Williams testified that, according to the Alexandria police, Mr. Peterson was shot at 12:52 a.m. Agent Williams testified that the defendant's phone recorded transactions between 12:45 a.m. and 12:55 p.m. using two sectors of a tower located near Willow Glen River Road and Seventh Street. The State submitted Agent Williams' map into evidence which indicates that location of the Ninth Street shooting and the location where Mr. Newell's vehicle was recovered.

Additionally, the State presented testimony regarding evidence collected from the various crime scenes. With regard to the Monroe Street incident, Deputy Deidre Allen testified that she found a bullet fragment on the sidewalk and blood

16

on the ground roughly where the victim told her that he had been shot. On Ninth Street, Officer Edward Scott testified that he recovered shell casings from a .380 handgun from the location where Mr. Peterson said the shooter was standing. Officer Scott also testified that he found a bullet hole in the wall of a neighbor's residence and that a bullet was collected from the neighbor's bathroom.

Lieutenant Bates testified that from the defendant's residence, which he explained was three or five blocks from the location of the Ninth Street shooting, was searched but that "[n]othing of value was found at his residence." Further, Lieutenant Bates testified that a .22 caliber bullet was recovered from Mr. Marzette's body and that he recovered four .380 fired cartridge casings on the southwest corner of Florence and Monroe Street.

Lieutenant Bates also stated that he processed Mr. Newell's Honda for fingerprints and that he recovered fifteen latent prints from the vehicle. According to Lieutenant Bates, a fingerprint found on the inside driver door handle was identified as belonging to the defendant. He further stated that he tested the remaining prints against the fingerprints of various individuals, but that none of those individuals' prints matched any of the remaining unidentified prints. Lieutenant Bates also indicated that no fingerprints were found on the shell casings.

Michael Stelly, who works for the North Louisiana Crime Lab, testified with regard to the bullets—which included a bullet jacket—and shell casings recovered at the crime scene. Mr. Stelly testified that he examined the four fired .380 cartridge cases collected from the scene of the Monroe Street incident, and the two fired .380 cartridge cases collected from the scene of the Ninth Street incident. According to Mr. Stelly, he determined that all six cartridge cases were fired from

one weapon. With regard to the bullet and the bullet jacket, Mr. Stelly testified that he could not determine whether they were fired from the same weapon because the bullet jacket was damaged, but that he could tell they were fired from a weapon with the same class characteristics. Mr. Stelly also noted that, because .380 cartridges have the same diameter but are slightly shorter than 9mm cartridges, it was possible to fire a .380 bullet from a 9mm weapon.

Mr. Stelly also testified that he examined the bullet recovered from Mr. Marzette's body. According to Mr. Stelly's testimony, that bullet was a .22 caliber bullet. Mr. Stelly testified that, because a .22 caliber bullet could not be fired out of a .380 caliber weapon, that those were "two different guns." Mr. Stelly also observed that, because a ".22 is a small cartridge with a lot less gun powder" it has a "lot less bang, lot less noise when it exits the barrel of a gun."

With regard to the State's burden of proving the charge of felon in possession of a firearm, the defendant stipulated that he had previously been convicted of "possession of CDS Schedule II, Cocaine, a felony on June 21, 2011."

Following the close of the State's case, the defendant presented various witnesses, including his mother, Olivia Richardson. Ms. Richardson testified that her son lives with her on Woodard Street. According to her testimony, the defendant, who was driving a "tannish, gold Honda" came to her house at approximately 11:45 p.m. with Quantavious Frazier. The defendant retrieved his cell phone charger and left at most five minutes later. Ms. Richardson later stated that she saw her son several times that evening—at 11:15 p.m., at approximately 11:35 p.m., and at 11:45 p.m. She testified that:

> [The State] He drove up at the time in a Honda. At eleven fifteen?

[Ms. Richardson] Yes, sir.

Q   He stayed in the house for a few minutes.  Left in the Honda?

A  Yes, sir.

Q  Okay.  Then you don't see him again until eleven fifty?

A  No.  He same [sic] to the house – eleven fifty was the third time.  That's what [sic] I told him what I told him.  He came the first time.  He left and he came right back.  That was the second time.  The third time was eleven forty-five.  That's when I told him, the next time you come here you come in to stay.

Ms. Richardson also testified that the defendant returned home again at 2:30 a.m. Further, Ms. Richardson stated that she had made it clear to the defendant that she did not want any guns in the house.  According to her testimony, this was because of her own felony convictions.

Misty Deleery and Breaisha Davis both testified that the defendant arrived at their house on Park Avenue starting at approximately 12:10 a.m. and stayed for over an hour.  According to both Ms. Deleery and Ms. Davis, while the defendant was at their house, Ms. Deleery tried to braid his hair.  Ms. Deleery stated that she remembered the time period that he was there because she took a phone off of the charger before the defendant arrived and had seen the time and that her mother later woke up and yelled at them to come back inside because it was almost 1:00 a.m.   Ms. Deleery did admit that she told the police "I don't know" when questioned about whether the defendant could have left at 12:30 a.m.  When asked how the defendant left, she replied "[w]alking."  She also denied seeing a car.

Further, Ms. Davis was positive that the defendant was at her house between midnight and 1:00 a.m.  However, when questioned by the State, Ms. Davis insisted that she and Ms. Deleery had been taken to the police station on the same

19

date and that she had given her statement to the police on October 1, 2011. Ms. Davis testified that she was "a hundred percent" positive that she only went to the police station one time. However, when questioned by the State as to why her statement was dated October 3, 2011, Ms. Davis testified:

> [The State]  Okay.  And you recall the police officer said to you on October the third - -
>
> [Ms. Davis] Mm-hmm.
>
> Q - - I picked you up on Sunday and I had you come down here to the police station but you were too high for me to get a statement from you.  Is that right?  And what was your response on October the third?
>
> A  I said, I guess.

Dantavious Lindsey testified that he was with the defendant in the early morning hours of September 28, 2011.  Mr. Lindsey testified that the defendant came to get some "weed" from him at his mother's house on Gabriel Lane. According to Mr. Lindsey, the defendant, who was in a gold Honda, arrived at "like one o'clock.  Between twelve and" 1:00 a.m.  Mr. Lindsey later testified that it was right after midnight.  Mr. Lindsey also testified that Davetreous "Boomer" Howard was already in the vehicle with the defendant.  Mr. Lindsey denied seeing a gun or ammunition in the vehicle and denied seeing the defendant with a gun.

According to Mr. Lindsey's testimony, they dropped Mr. Howard off on Tulane Avenue and then went to go pick up Travius "Cat" Warden from his grandmother's house, which was also on Tulane Avenue.  Mr. Lindsey testified as follows:

> [The defendant's attorney] When Cat got into the vehicle – when Travius Warden got in the vehicle, did he have any firearms?
>
> [Mr. Lindsey] No, sir.

Q And during the period of time y'all were in the car, did he shoot at anybody?

A No, sir.

Q Did you even have a gun on you?

A No, sir.

Q Did Tedrick shoot anyone?

A No, sir.

Q No shooting?

A No, sir. And no one shooting.

Mr. Lindsey further testified that after they picked up Mr. Warden, they all went to the BP station on Lee Street to get some cigars. Mr. Lindsey denied going to Sirderian Caesar's house or seeing Daniel Guillot. Mr. Lindsey also stated that they went to the defendant's house sometime after midnight to charge the defendant's cell phone.

Davetreous Howard also testified. Mr. Howard stated that everyone calls him "Boomer." According to Mr. Howard's testimony, the defendant was getting his hair done on Park Avenue at 12:45 or 1:00 a.m. when Mr. Howard walked up and asked the defendant for a ride. Mr. Howard stated that they stayed at the house on Park Avenue for thirty to forty-five minutes. However, Mr. Howard later stated that he was already at the house on Park Avenue charging his phone when the defendant walked up. Mr. Howard remembered that the defendant had a brown Honda, and that defendant dropped him off in Phoenix Point. Mr. Howard denied seeing the defendant with a gun and denied shooting at anyone.

Travius Warden, who explained that everyone calls him "Cat," testified that he was on his bicycle when he saw the defendant driving a tan Honda. Mr.

21

Warden stated that the defendant was with Mr. Lindsey, whom he called "Lil' Dan," at that time. According to Mr. Warden, the defendant came back and picked him up between midnight and 1:00 a.m. Mr. Warden testified as follows:

> [The defendant's attorney] Okay. All right. When you got in the back of the vehicle, did you see Tedrick with a gun?
>
> [Mr. Warden] No.
>
> Q Did you see Lil' Dan with a gun?
>
> A No. I ain't seen no guns.
>
> Q Did you see any guns in the vehicle at all?
>
> A No, sir. No, sir.
>
> Q Did you see any bullets in the vehicle?
>
> A No, sir.
>
> Q Any ammunition in the vehicle?
>
> A No, sir.

Mr. Warden also testified that they went to the BP station to get some cigars. According to his testimony, eventually they ended up going to the defendant's house and sat outside in the car talking until at least 4:00 a.m. Mr. Warden admitted that in his first statement he said that they stayed outside talking until 2:30 a.m. Mr. Warden further denied seeing Sirderian Caesar or Daniel Guillot.

Sirderian Caesar testified that his cousin lives on the corner of Sixth and Green Oaks. Mr. Caesar denied being at his cousin's house at 1:00 a.m. on the morning of September 28, 2011. Mr. Caesar further stated that his cousin does not allow people to "smoke weed" at her house and does not allow people to be there late at night. Shedrick Metoyer testified that he was not at Sirderian Caesar's

22

house at 1:00 a.m. on the morning of September 28, 2011, and confirmed that if Mr. Guillot said that he saw him there "[t]hen it's all a lie."

With regard to the defendant's convictions for negligent homicide and attempted second degree murder, and having viewed this evidence in the light most favorable to the prosecution, we conclude that there is sufficient evidence to support these convictions. Notably, the defendant did not contest that he was in Mr. Newell's car on the night in question. Instead, he referenced various inconsistencies in his own statement, along with that of other witnesses, to suggest that the person he named as the shooter in his statement was not in the vehicle. However, there was sufficient evidence that the jury could have determined both that Mr. Newell's car was the one used in all three shootings and that the defendant was in Mr. Newell's car at the time of the shootings. Most importantly, the defendant's statement, which was played for the jury, admitted both of these facts. The defendant's fingerprints were also located on the driver's door handle of Mr. Newell's vehicle.

Certainly, there were notable inconsistencies between the witnesses' testimonies with regard to the time of each shooting and the description of the vehicle. We observe that Mr. Guillot's testimony about when he encountered the defendant in the holding cell was inconsistent with the officer's testimony about when the defendant was booked. Similarly, the defendant's alibi witnesses offered inconsistent statements about when they encountered the defendant on the night in question and those witnesses' testimonies contradicted the defendant's statement to the police that he was involved. However, the jury, as the trier of fact, could accept or reject, in whole or in part, the testimony of any witness, and it was within the jury's purview to resolve those inconsistencies. *Macon*, 957 So.2d 1280. We

23

note that, if accepted by the jury, there was sufficient evidence to place the defendant's cell phone in the general area of each shooting at the approximate time of each incident. Further, there was testimony that the defendant was seen with a 9mm semi-automatic, which, testimony revealed, was capable of firing the .380 caliber cartridges recovered at two of the crime scenes.

However, the defendant's mere presence in the vehicle at the time of the shooting does not necessarily impose criminal liability. Having concluded that there is sufficient evidence to support a conclusion that the defendant was in Mr. Newell's vehicle at the time of the shootings, the relevant determination is whether there is sufficient evidence to conclude that he was a principal to the crimes for which he was convicted. Louisiana Revised Statutes 14:24 addresses the law of principals, stating "[a]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals." In *State v. Mason*, 10-28, p. 9 (La.App. 5 Cir. 1/11/11), 59 So.3dd 419, 425-26, *writ denied*, 11-306 (La. 6/24/11), 64 So.3d 216, the fifth circuit explained accomplice liability, stating:

> Only those persons who "knowingly participate in planning or execution of a crime" are principals to that crime. *State v. King*, 06-554, pp. 7-8 (La.App. 5 Cir. 1/16/07), 951 So.2d 384, 390, *writ denied*, 07-0371 (La.5/4/07), 956 So.2d 600 (quotation omitted). An individual may only be convicted as a principal for those crimes for which he personally has the requisite mental state. *King*, supra. The mental state of one defendant may not be imputed to another defendant. Thus, mere presence at the scene of a crime does not make one a principal to the crime. *Id*. However, it is sufficient encouragement that the accomplice is standing by at the crime scene ready to give some aid if needed, although in such a case it is necessary that the principal actually be aware of the accomplice's intention. *State v. Anderson*, 97-1301, p. 3 (La.2/6/98), 707 So.2d 1223, 1225 (per curiam) (quotation omitted).

However, a "general principle of accessorial liability" is that "when two or more persons embark on a concerted course of action, each person becomes responsible for not only his own acts but also for the acts of the other, including 'deviations from the common plan which are the foreseeable consequences of carrying out the plan.'" *State v. Acker*, 12-1116, p. 12 (La.App. 3 Cir. 4/3/13), 111 So.3d 535, 546 (quoting *State v. Smith*, 07-2028 (La. 10/20/09), 23 So.3d 291).

Having reviewed the record in the light most favorable to the prosecution, we conclude that there is sufficient evidence to support such a conclusion. Although the defendant denied firing the gun, in his statement he admitted that he was in the vehicle on three occasions when another person shot out of the car. With regard to the Monroe Street incident, the defendant's statement indicates that he knew that another person, who he alleged to be Mr. Dotson, was shooting at a person. The crime of attempted second degree murder requires that the defendant have the specific intent to kill. *See Thomas*, 48 So.3d 1210. Specific intent may be established by circumstantial evidence and "[i]t is well-settled that the act of pointing a gun at a person and firing the gun is an indication of the intent to kill that person." *Id.* at 1215. Similarly, the jury could have concluded that the defendant agreed to render aid to the shooter by agreeing to "make the block" and then following through on that action even after he heard gunshots.

Further, our courts have determined that where a defendant is present for multiple criminal acts and remains with the person or persons committing the criminal acts, the defendant's intent to participate can be inferred from his continued presence. *Acker*, 111 So.3d 535 (citing *State v. Scroggins*, 40,746 (La.App. 2 Cir. 3/22/06), 926 So.2d 64, *writ denied*, 06-098 (La. 11/3/06), 940 So.2d 655). Accordingly, although the defendant's statement may be interpreted

25

as downplaying his involvement in the alleged offenses, there was sufficient evidence for the jury to infer that the defendant had the opportunity to leave the group but chose not to do so. In turn, the jury could have also inferred that the defendant possessed the requisite criminal intent for each of the homicide convictions. As to the negligent homicide conviction, we conclude that the jury could have found that the defendant was criminally negligent as "[t]he evidence supports a finding that the circumstances indicate that the [defendant], in the ordinary course of human experience, must have adverted to the prescribed criminal consequences as reasonably certain to result from his act or failure to act." *Scroggins*, 926 So.2d at 69. Additionally, the nature of those circumstances supports a finding of a specific intent to kill, as is required for each of the convictions for second degree murder. Specifically, La.R.S. 14:10(1) explains, that "specific criminal intent" "exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences of his act or failure to act."

The defendant also argues that his statement to the police was an admission and not a confession. Thus, the defendant argues, the only evidence available for the jury to consider was circumstantial evidence, and the State failed to exclude every reasonable hypothesis of innocence as required by La.R.S. 15:438.

"The term "admission" is applied to those matters of fact which do not involve criminal intent; the term "confession" is applied only to an admission of inculpatory facts and a confession of guilt." *State v. Marr*, 626 So.2d 40, 45 (La.App. 1 Cir. 1993)(quoting *State v. Jones*, 451 So.2d 35 (La.App. 2 Cir.), *writ denied*, 456 So.2d 171 (La.1984)), *writ denied*, 93-2806 (La. 1/7/14), 631 So.2d

26

455. In *State v. Boothe*, 532 So.2d 203, 206 (La.App. 3 Cir. 1988), a panel of this court explained that there are three categories of incriminating statements:

> The first category is the confession which admits the guilt of the crime charged. The second is the admission which involves the existence of criminal intent. The third is the admission or acknowledgment of facts which tend to establish guilt, but which do not involve the existence of criminal intent. The Court concluded that remarks which were not express admissions of guilt or facts showing criminal intent can be introduced without the foundation necessary for admitting a confession, despite the fact that the statements might be considered inculpatory.

In this context, the distinction between a confession and an admission is that a confession is considered direct evidence while an admission is considered circumstantial evidence. *State v. Hunter*, 39,664 (La.App. 2 Cir. 6/29/05), 907 So.2d 200, *writ denied*, 05-2027 (La. 3/10/06), 925 So.2d 507.

Here, we conclude that whether or not the defendant's statement constitutes an admission, a confession, or a combination of both, there was sufficient evidence to support the defendant's convictions for negligent homicide and attempted second degree murder. As stated in *Major*, 888 So.2d at 801, La.R.S. 15:438 "does not establish a stricter standard of review than the more general rational juror's reasonable doubt formula[.]" As previously discussed, we conclude that the evidence and testimony, including the defendant's own statement, contains enough information to support the jury's finding that the defendant was a willing participant. *See Scroggins*, 926 So.2d 64.

Accordingly, we find that there was sufficient evidence to support the defendant's convictions for negligent homicide and attempted second degree murder.

We further find that the State presented sufficient evidence to support the defendant's conviction for possession of a firearm by a convicted felon. Notably,

27

Mr. Guillot testified that he saw the defendant with a firearm on his back belt loop. Mr. Guillot's testimony was sufficient such that, if believed by the jury, they could have concluded that the defendant possessed the intent to possess a firearm. Further, the defendant stipulated that he had been convicted of "possession of CDS Schedule II, Cocaine, a felony on June 21, 2011." That date is within the ten-year cleansing period described by La.R.S. 14:95.1. Accordingly, we conclude that there was sufficient evidence to support the defendant's conviction for possession of a firearm by a convicted felon.

In sum, the defendant's assignments of error with regard to the sufficiency of the evidence are without merit.

*Sentencing*

The defendant also asserts that his sentences were unconstitutionally excessive. Specifically, the defendant contends that the imposition of consecutive sentences for the convictions of negligent homicide and two counts of attempted second degree murder rendered his sentences excessive.

The law with regard to excessive sentences is well-settled. In *State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331, this court explained that:

> La. Const. art. I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La.6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing

28

discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

Further, in *State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061, the supreme court elaborated that:

> In deciding whether a sentence is shocking or makes no meaningful contribution to acceptable penal goals, an appellate court may consider several factors including the nature of the offense, the circumstances of the offender, the legislative purpose behind the punishment and a comparison of the sentences imposed for similar crimes. *State v. Smith*, 99-0606 (La.7/6/00); 766 So.2d 501. While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir.1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La.5/31/96); 674 So.2d 957, 958.

Additionally, La.Code Crim.P. art. 894.1 contains a list of sentencing guidelines, and the trial court must "state for the record the considerations taken into account and the factual basis therefor in imposing sentence." La.Code Crim.P. art. 894.1(C). However, the trial court need not articulate every circumstance or read through a checklist in order to comply with La.Code Crim.P. art. 894.1(C). *State v. Herbert*, 12-228 (La.App. 3 Cir. 6/13/12), 94 So.2d 916, *writ denied*, 12-1641 (La. 2/8/13), 108 So.3d 78. Yet, the record should sufficiently establish that the trial court adequately considered Article 894.1's guidelines in imposing a defendant's sentence. *Id.*

With regard to concurrent and consecutive sentences, La.Code Crim.P. art. 883 states that:

> If the defendant is convicted of two or more offenses based on the same act or transaction, or constituting parts of a common scheme or

> plan, the terms of imprisonment shall be served concurrently unless the court expressly directs that some or all be served consecutively. Other sentences of imprisonment shall be served consecutively unless the court expressly directs that some or all of them be served concurrently. In the case of the concurrent sentence, the judge shall specify, and the court minutes shall reflect, the date from which the sentences are to run concurrently.

Accordingly, concurrent sentences are preferred when a defendant's offenses arise from a common scheme or plan. *State v. Bethley*, 12-853 (La.App. 3 Cir. 2/6/13), 107 So.3d 841. It is, however, within the trial court's discretion to impose consecutive sentences provided that the trial court articulates particular justification for doing so at sentencing. *Id.* "The factors to consider when imposing consecutive sentences include defendant's criminal record, the severity or violent nature of the offenses, or the danger the defendant poses to the public." *Id.* at 850 (quoting *State v. Wallace*, 11-1258 (La.App. 3 Cir. 5/30/12), 92 So.3d 592, *writ denied*, 12-1861 (La. 3/8/13), 109 So.3d 355, *writ denied*, 12-1865 (La. 3/8/13), 109 So.3d 355.

As for negligent homicide, La.R.S. 14:32(C) provides that "whoever commits the crime of negligent homicide shall be imprisoned with or without hard labor for not more than five years, fined not more than five thousand dollars, or both." Further, and with regard to the two convictions for attempted second degree murder, a violation of La.R.S. 14:30.1 and La.R.S. 14:27, those offenses were punishable by ten to fifty years at hard labor, without benefit of probation, parole, or suspension of sentence. *See also State v. Thomas*, 10-806 (La.App. 3 Cir. 4/27/11), 63 So.2d 343, *writ denied*, 11-0963 (La. 10/21/11), 73 So.3d 382. Finally, La.R.S. 14:95.1, relative to possession of a firearm by a convicted felon, provides that "[w]hoever is found guilty of violating the provisions of this Section shall be imprisoned at hard labor for not less than ten nor more than twenty years

without the benefit of probation, parole, or suspension of sentences and be fined not less than one thousand dollars nor more than five thousand dollars." However, these sentences must be viewed within the context of La.R.S. 15:529.1[4] as the defendant was found to be a second felony habitual offender and, thus, under these circumstances each sentence could not have been "less than one-half the longest term and not more than twice the longest term prescribed for a first conviction."

Reference to the sentences indicates that the trial court stayed within the above framework as, upon the determination that the defendant was a second felony habitual offender, it sentenced the defendant to ten years without the benefit of probation or suspension of sentence for his negligent homicide conviction; twenty-five years without benefit of probation or suspension of sentence for each conviction for attempted second degree murder; and fifteen years without the benefit of probation or suspension of sentence for the felon in possession of a firearm conviction. Accordingly, we conclude that all of the defendant's sentences are within the statutory range.

Further, our review of the transcript from the defendant's sentencing hearing indicates that the trial court gave lengthy reasons for the sentences, noting the presence of limited mitigating circumstances, the random, "egregious" nature of

---

[4] In particular, Louisiana Revised Statutes 15:529.1 provides, in pertinent part, that:

A. Any person who, after having been convicted within this state of a felony, or who, after having been convicted under the laws of any other state or of the United States, or any foreign government of a crime which, if committed in this state would be a felony, thereafter commits any subsequent felony within this state, upon conviction of said felony, shall be punished as follows:

(1) If the second felony is such that upon a first conviction the offender would be punishable by imprisonment for any term less than his natural life, then *the sentence to imprisonment shall be for a determinate term not less than one-half the longest term and not more than twice the longest term prescribed for a first conviction.*

(Emphasis added).

31

the crimes, and the lack of motivation in choosing the victims. The trial court further remarked upon a lack of remorse demonstrated by the defendant. Thus, we also conclude that the trial court adequately considered the sentencing guidelines of La.Code Crim.P.art. 894.1.

Addressing the defendant's particular concern regarding the consecutive nature of the sentences, we note that the trial court explained that:

> The final issue before the Court is to determine whether the sentences imposed should run concurrently or consecutively with each other. The Court is aware of the option and so today I find that they are consecutive. The evidence, well to an extent. The evidence clearly established 3 separate occurrences in this case. Defendant shot the first victim, drove to another part of town looking for a second innocent victim, shot him, drove around some more to find a third innocent victim, shot at him. Fortunately the last bullet didn't meet its target and Mr. Petersen was unharmed. Obviously each of these shootings amounted to a separate crime with separate intent to harm by the defendant. To run the sentences concurrent for these 3 convictions in this case would be to minimize the seriousness of each separate offense. Defendant would essentially benefit from the fact that he chose 3 and not just 1 victim.

On review, we find that the trial court adequately considered the factors necessary to justify the imposition of consecutive sentences. In addition to the above excerpt which addresses the separate temporal element of each event, the trial court considered the defendant's previous history, including the fact that the defendant was on probation at the time of these offenses; the gravity of the offense; the "significant, permanent injury" done to the victims; and the risk to the general public posed by the defendant. The trial court specifically noted in that regard that the defendant's offenses appeared to be "some kind of random game[.]" Thus, we conclude that the trial court adequately expressed its reasons for imposing consecutive sentences.

Finally, we point out that the supreme court has admonished "that sentence review under the Louisiana constitution does not provide an appellate court with a vehicle for substituting its judgment for that of a trial judge as to what punishment is more appropriate in a given case." *State v. Mouton*, 15-287, p. 15 (La.App. 3 Cir. 10/7/15), 175 So.3d 1122, 1133 (quoting *State v. Savoy*, 11-1174 (La. 7/2/12), 93 So.3d 1279). With that precept in mind, and considering the reasons given by the trial court, we find that the defendant's sentences are not constitutionally excessive.

This assignment of error is without merit.

## DECREE

For the foregoing reasons, the convictions and sentences of the defendant, Tedrick Jewan Richardson, for negligent homicide, attempted second degree murder, and possession of a firearm by a convicted felon are affirmed. The trial court is instructed to correct the minutes and the commitment order to reflect the transcript as to the imposition of sentences without a parole restriction.

**AFFIRMED WITH INSTRUCTIONS.**

# COURT OF APPEAL

# THIRD CIRCUIT

# STATE OF LOUISIANA

# 16-107

STATE OF LOUISIANA

VERSUS

TEDRICK JEWAN RICHARDSON

**Cooks, J. dissenting.**

I respectfully disagree with the majority's holding. I believe the law applied to the facts here establishes this is a case of circumstantial evidence only. Thus, Defendant's claim of insufficiency of evidence must be evaluated not under the reasonable doubt standard, as the majority applies, but under the analysis that determines whether "the evidence excludes every reasonable hypothesis of innocence." *State v. Draughn*, 05-1825, p.7 (La.1/17/07), 950 So.2d 583, 592, *cert denied*, 552U.S. 1012, 128 S.Ct. 537 (2007). *See also* La.R.S. 15:438. Additionally, I am convinced the evidence shows the State failed to meet its burden of proof. I also believe the trial court legally erred in failing to properly instruct the jury on the State's burden of proof in a case involving only circumstantial evidence. Defendant's counsel twice requested a jury instruction be added informing the jury of the State's burden to prove guilt by presenting evidence sufficient to exclude every reasonable hypothesis of innocence in cases involving only circumstantial evidence. The trial judge, freely admitting this was her first criminal trial, accepted the State's argument that Defendant's statement to police when coupled with Daniel Guillot's (Guillot) testimony, meant there was direct evidence in the case. This argument was not correct as to the three

1

shootings. This error of law mandates a reversal of the conviction and a remand for new trial.

The majority opinion does not discuss whether the case is one based solely on circumstantial evidence, direct evidence, or a combination thereof, but merely concludes the evidence is sufficient to convict Defendant beyond a reasonable doubt. In this case the determination of the proper burden of proof is critical. Further, the evidence to my mind is insufficient to establish guilt beyond a reasonable doubt and does not come close to excluding every reasonable hypothesis of innocence. The "lack of sufficient evidence to sustain the conviction would entitle defendant to an acquittal under *Hudson v. Louisiana*, 450 U.S. 40, 44-45 (1981)." *State v. Rodricus C. Crawford*, 2014-2153, (La. 11/16/16) ___ So.3d___, 2016 WL 6780518, *citing Hudson* and *State v. Mickelson*, 12-2539, p.5 (La. 9/3/14), 149 So. 3d 178, 182. In *Crawford* the state supreme court, relying on *State v. Davis*, 92-1623 (La. 5/23/94), 637 So.2d 1012, recently explained the *Jackson* standard[1] applied to circumstantial evidence cases as follows:

> In circumstantial evidence cases, this court does not determine whether another possible hypothesis suggested by a defendant could afford an exculpatory explanation of the events. Rather, this court, evaluating the evidence in the light most favorable to the prosecution, determines whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt under *Jackson v. Virginia*[.]
>
> The *Jackson* standard does not permit this court to substitute its own appreciation of the facts for that of the factfinder. *State v. Robertson*, 96–1048, p. 1 (La. 10/4/96), 680 So.2d 1165, 1166. It is not the province of the reviewing court to assess the credibility of witnesses or reweigh evidence. *State v. Smith*, 94–3116, p. 2 (La. 10/16/95), 661 So.2d 442, 443. As explained in *State v. Mussall*, 523 So.2d 1305, 1310 (La. 1988):

---

[1] *Jackson v. Virginia*, 443 U.S. 307 (1979).

> If *rational* triers of fact could disagree as to the interpretation of the evidence, the *rational* trier's view of all of the evidence most favorable to the prosecution must be adopted. Thus**, *irrational* decisions to convict will be overturned**, *rational* decisions to convict will be upheld, and the actual fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law. [Footnote omitted.]

*Crawford*, 2014-2153 at p. 9.

A review of the evidence presented in this case discloses numerous significant contradictions and inconsistencies when compared to Defendant's admissions. The evidence when viewed in the light most favorable to the prosecution does not exclude every reasonable hypothesis of innocence. Moreover, the evidence is insufficient under the *Jackson* standard to rationally support a conviction as to the three shootings. In *State v. Coleman*, 02-634, pp. 5-6 (La.App. 4 Cir. 10/23/03), 831 So.2d 375, 378, *writ denied*, 02-3197 (La.12/19/03), 861 So.2d 562, (emphasis added) the fourth circuit, reiterating its previous holding in *State v. Brealy*, 00-2758 (La.App. 4 Cir. 11/5/01), 800 So.2d 1116, 1120-21, said:

> The Due Process Clause of the Fourteenth Amendment protects a person accused of a crime from being convicted unless the State proves every element of the offense charged beyond a reasonable doubt. This constitutional protection is the basis of a reviewing court's duty to determine the sufficiency of the evidence used to convict a defendant. *State v. Monds,* 91-0589 (La.App. 4 Cir.1994), 631 So.2d 536. In deciding whether evidence is constitutionally sufficient to support a conviction, the appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Jacobs,* 504 So.2d 817 (La.1987).

3

The appellate court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime. *State v. Mussall,* 523 So.2d 1305, 1311 (La.1988); *State v. Monds, supra,* p. 4, 631 So.2d at 539. If the reviewing court finds that no rational trier-of-fact, viewing all the evidence from a rational pro-prosecution viewpoint, could have found the defendant guilty beyond a reasonable doubt, the conviction cannot stand constitutional muster. *Mussall, supra.* **When identity is disputed, the state must negate any reasonable probability of misidentification in order to satisfy its burden to establish every element of the crime charged beyond a reasonable doubt.** *Jackson v. Virginia, supra; State v. Smith***, 430 So.2d 31, 45 (La.1983).**

The reviewing court, however, is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence. *State v. Smith,* 600 So.2d 1319, 1324 (La.1992); *Mussall, supra,* at 1311. As noted by the Supreme Court, "the court is not to substitute its judgment of what the verdict should be for that of the jury**, but at the same time the jury cannot be permitted to speculate if the evidence is such that reasonable jurors must have a reasonable doubt."** *Mussall, supra,* at 1311 (citation omitted).  Although a conviction based solely on the identification testimony of one witness may withstand a sufficiency of the evidence test, **it will do so only "[i]n the absence of internal contradiction or irreconcilable conflict with physical evidence...."** *State v. Gipson,* 26,433, p. 2 (La.App. 2 Cir. 10/26/94), 645 So.2d 1198, 1200.

The Louisiana State Supreme Court in *State v. Neal*, 00-674, p. 11 (La. 6/29/01), 796 So.2d 649, 658, made it clear "As a general matter, when the key issue is the defendant's identity as the perpetrator, rather than whether the crime

4

was committed, the State is required to negate any reasonable probability of misidentification." (citations omitted) This forms part of the proper framework for this court's review of this conviction. One significant question here is whether the evidence sufficiently shows the State successfully negated "any reasonable probability" that Defendant was misidentified. Additionally, the veracity of Defendant's admissions of fact is seriously undermined by 1) the coercive nature under which these admissions were obtained from a youthful person over a period of five hours; 2) by the suggestive manner through which the police directed Defendant's admissions; and 3) by the contradictory and inconsistent evidence presented at trial. The numerous instances of evidence contradicting or failing to substantiate Defendant's "admissions" demonstrate the State failed to exclude every reasonable hypothesis of innocence and failed to negate the reasonable probability of misidentification of Defendant.

The United States Supreme Court has often recognized and wrestled with the persistent problem of false confessions or admissions. As the court observed in *J.D.B., Petitioner v. North Carolina*, 564 U.S. 261, 131 S.Ct. 2394, 180 L.Ed.2d 310 (2011):

> Any police interview of an individual suspected of a crime has "coercive aspects to it." *Oregon v. Mathiason,* 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) *(per curiam)*. Only those interrogations that occur while a suspect is in police custody, however, "heighte[n] the risk" that statements obtained are not the product of the suspect's free choice. *Dickerson v. United States,* 530 U.S. 428, 435, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000).
>
> By its very nature, custodial police interrogation entails "inherently compelling pressures." *Miranda,* 384 U.S., at 467, 86 S.Ct. 1602. Even for an adult, the physical and psychological isolation of custodial interrogation can "undermine the individual's will to resist and ... compel him to speak where he would not otherwise do so freely." *Ibid.* Indeed, **the pressure of custodial interrogation is so immense that it "can induce a frighteningly**

5

**high percentage of people to confess to crimes they never committed**." *Corley v. United States,* 556 U.S. 303,129 S.Ct. 1558, 1570, 173 L.Ed.2d 443 (2009) (citing Drizin & Leo, The Problem of False Confessions in the Post–DNA World, 82 N.C.L.Rev. 891, 906–907 (2004)); see also *Miranda,* 384 U.S., at 455, n. 23, 86 S.Ct. 1602. That risk is all the more troubling—and recent studies suggest, all the more acute—when the subject of custodial interrogation is a juvenile. *See* Brief for Center on Wrongful Convictions of Youth et al. as *Amici Curiae* 21–22 (collecting empirical studies that "illustrate the heightened risk of false confessions from youth").

Recognizing that the inherently coercive nature of custodial interrogation "blurs the line between voluntary and involuntary statements," *Dickerson,* 530 U.S., at 435, 120 S.Ct. 2326, this Court in *Miranda* adopted a set of prophylactic measures designed to safeguard the constitutional guarantee against self-incrimination . . . And, if a suspect makes a statement during custodial interrogation, the burden is on the Government to show, as a "prerequisit[e]" to the statement's admissibility as evidence in the Government's case in chief, that the defendant "voluntarily, knowingly and intelligently" waived his rights. *Miranda,* 384 U.S., at 444, 475–476, 86 S.Ct. 1602; *Dickerson,* 530 U.S., at 443–444, 120 S.Ct. 2326.

*J.D.B. v. N. Carolina*, 564 U.S. 261, 268–70, 131 S.Ct. 2394, 2401, 180 L.Ed.2d 310 (U.S.2011) (emphasis added).

In *Corley,* addressing the six hour provision provided in 18 U.S.C. § 3501, the high court found the statute was meant only to limit the *McNabb-Mallory* [2]presentment exclusionary rule, not eliminate it. That legislation provides that a confession is not inadmissible " 'solely because of delay in bringing such person before a magistrate judge . . . if such confession is found by the trial judge to have been made voluntarily and . . . within six hours [of arrest]; it extends that time limit when further delay is 'reasonable considering the means of transportation and the distance to . . . the nearest available [magistrate].' " *Corley,* 129 S. Ct. at 1559.

---

[2] *McNabb v. United States*, 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819 (1943) and *Mallory v. United States*, 354 U.S. 449, 77 S.Ct. 1356, 1 L.Ed.2d 1479 (1957) held that an arrested person's confession is inadmissible when given after unreasonable delay to bring him before a judge.

6

The United States Supreme Court reasoned:

> In a world without *McNabb–Mallory*, federal agents would be free to question suspects for extended periods before bringing them out in the open, and we have always known what custodial secrecy leads to. See *McNabb,* 318 U.S. 332, 63 S.Ct. 608, 87 L.Ed. 819. No one with any smattering of the history of 20th-century dictatorships needs a lecture on the subject, and we understand the need even within our own system to take care against going too far. "[C]ustodial police interrogation, by its very nature, isolates and pressures the individual," *Dickerson, 321* 530 U.S., at 435, 120 S.Ct. 2326, and **there is mounting empirical evidence that these pressures can induce a frighteningly high percentage of people to confess to crimes they never committed . . . .**

*Corley*, 556 U.S. at 320–21(citation omitted) (emphasis added).

I believe the Defendant in this case is a prime example of a young person, who after over five hours in police custody, made false admissions concerning crimes he did not participate in. An examination of Defendant's version of the facts obtained by the police interrogator's suggestive questioning resulted in what the evidence shows to be false admissions of facts which formed the basis of a flawed conviction. It appears to me from my review of the record that the police had a theory of the chain of events concerning the three shootings and guided Defendant's admissions in accordance with their chronology of events which proved to be incorrect at trial.

In his admissions of fact Defendant told police the following:

> Q: Okay. Alright Tedrick there was uh incident that happened uh on uh yesterday uhm which started on Monroe Street. Start telling us what happened starting from Monroe Street . . .
>
> . . . .
>
> A: Okay we rode … uh at first I was the driver. And then Mike forced like made me like make him drive. Like let him drive. While he was driving we went down Chester Street at first. And then we made it to Monroe Street. We made a right on Monroe Street. We

7

rode down. And while I was in the passenger seat we made a couple of shots. My home boy Taye was in the backseat.

Q: Okay. He—who made a couple of shots?

A: Mike. Mike shot a couple of shots, about two or three shots.

Q: Okay. Did he—where was Mike sitting at?

A: He was in the driver seat.

Q: Oh he was driving at that point?

A: On Monroe Street yes sir.

Q: Okay. And did he drive out of the … did he shoot out of the sunroof?

A: No not on Monroe Street.

Q: Okay not on Monroe Street. Okay what was the guy name that—do you know the guy that he—that y'all were shooting at?

A: No sir.

Q: That Mike shot at?

A: No.

. . . .

Q: (Sgt. Green): Alright. Okay and the next thing y'all went rolled—rolled down by Sixth Street is that correct?

A: Yes sir.

Q: Tell me what happened on Sixth Street?

A: We made it off the highway, off 49 on the exit to Lower Third. We passed up Peabody. Alright we passed up Ed Payne's store and we made a right on Sixth Street. When we made a right on Sixth Street and made it to the fork, to the fork in the road. Alright then…then Mike was like hold on, hold on, hold on before we made it down the street.

Q: Who was driving at that point?

A: I was driving.

8

. . . .

A: Yeah and I came to a complete stop about on Solomon.

Q: Right.

A: about on Solomon Street I think, I made a complete stop.
. . . .

A: He jumped out. He walked like up—like in front of the car a lil' bit. When he turned to the right I noticed he had a gun.

Q: Right

A: Again, well I already knew he had a gun cause he had shot
Q: Right

A: but I noticed when he asked me I noticed he had the gun. So I hurried up and smashed the gas when I made a right on John Thomas I think it is[.]

Q: uh-huh.

A: my home boy Taye was like hurry up and let me drive. You go get us busted, like that. So I let him drive. He made the block and picked Mike up. I was up in the backseat.

Q: Okay back on Sixth Street when Mike got out and he—he fired a couple of rounds when he got out?

A: Yeah. I heard a couple of rounds shot.

. . . .

Q: Alright. Alright. Then Travius wanted to drive?

A: Yeah.

Q: What happened then?

A: Alright uh Mike was driving I was in the backseat. And Taye was up in the passenger seat. Uh we made it past … what that is … the ball park Bringhurst field and I guess I was like noticed like rode like up it like, cause I was like kind of lazy like laying like-on like the headrest like this.

Q: Right.

9

A: with my hand to my head. And I just noticed Mike upping the gun out the sunroof. That's what made me like … really like come to my senses; cause I had been smoking weed. When I seen that I looked, I like tried to look to see who he was aiming the gun at, and I ain't seen nobody.

Q: Right

A: Then I heard like three shots. Well I seen him shoot like three times you know. He hurried up and smashed off. After that we went to—all went to MacDonalds and got something to eat.

Q: Uh-huh.

A: The he was said . . . well I asked him what he was fixing to do with the car cause it was almost time for to take it back. He said he got a spot to take it. And he pulled it right on like … what the name of that street is… um Ninth Street I think it is. Six, seven … six, seven…six, seven…on Eighth Street on a dead end street and parked it there.

. . . .

Q: Okay y'all just went separate ways from that point?

A: Yes sir.

*Texas Avenue Shooting*

In his statement, Defendant claimed the Texas Avenue shooting was the third and final shooting, and that he was laying down in the back seat of the car while Dotson was driving. Quontavius Frazier, aka "Taye," was in the front passenger seat. He stated Dotson fired three shots then "hurried up and smashed off." Defendant stated the first shooting was sometime between 8:00 and 9:00 p.m., and there was about three hours between the first shooting and the last. The evidence, however, showed the first shooting occurred on Texas Avenue, not on Monroe Street as suggested by the police when taking Defendant's statement. The first shooting resulted in the death of Mr. Joe Marzett. The only eyewitness to testify with respect to this shooting, Mr. Jamarques Starling (Starling), testified he

10

heard the shots between 11:30 and 11:45 p.m. on September 27, 2011, then shortly thereafter saw an "old school" Buick drive past. Noting this was the only car he saw on Texas Avenue for about ten minutes, Starling testified Defendant was not the driver of the car, although he did not get a good look at anyone else in the car. He was also unsure of the color of the car, describing the car at different times as light blue, gray, dark blue, and black. Insistent the car was an "old school" Buick, Starling's testimony did not connect the Honda Accord Defendant was in on the night in question to the scene of the crime.

Starling testified the shooting occurred between 11:30 and 11:45 p.m. but Defendant said in his statement the first shooting occurred between 8:00 and 9:00 p.m. Special Agent Williams mapped Defendant's cellphone usage around 11:55 p.m. There was a single text message which occurred at exactly 11:55 and the map notes that the phone was using sectors of the tower[3] that would place the phone northwest of the shooting. Another map of the area shows that prior to 11:50, Defendant's phone was being used in areas well away from the scene of the shooting, including on the opposite side of Highway 167 between 11:44 and 11:47 p.m., placing Defendant's phone somewhere between several blocks to a couple of miles away. Williams testified he did not "have any geolocation – a fancy way of saying general location – of the phone between eleven thirty and eleven forty-five."

Given that Starling could not identify either the Defendant or the car in which he was riding, nor could Special Agent Williams give any information regarding Defendant's location at the time of the shooting, the only evidence

---

[3] Special Agent Williams testified that each cell tower has three different sectors, each with a specific ID, and that each sector covers areas in different directions from the tower.

creating any connection between Defendant and the Texas Avenue shooting is Defendant's admission to police. That admission is contradicted by the other evidence presented. Defendant claimed they sped away from the shooting, while Starling says the vehicle was going slow when it passed him, only going "[f]ive to ten miles per hour." Defendant's statement regarding the timing of the shootings places this shooting as the last shooting but all of the evidence presented establishes this was the first shooting to occur. The first shooting did not occur on Monroe Street as police suggested to Defendant when taking his "statement." Given that the only part of Defendant's admission which is supported by any of the other evidence is the fact that someone actually fired a gun on Texas Avenue.

*Monroe Street Shooting*

Defendant's statement indicated there were only three people in the vehicle at the time of the Monroe Street shooting: Defendant, Dotson, and Frazier. Defendant also indicated Dotson fired two or three shots and that the shooting was the first shooting which occurred sometime between 8:00 and 9:00 p.m. on September 27, 2011, rather than after midnight on September 28, 2011 as the evidence showed. Daryl White (White) testified he was walking down Monroe Street towards a friend's house when he saw a car drive past him, turn a corner and stop, and then someone fired about six shots at him. Specifically noting he got a good look at the car while it was stopped under a streetlight, White stated he believed the vehicle was gray, and was certain that the windows were all tinted, except that the tint on the front passenger side was torn, so he was able to see into the car and saw four people in the car. He testified he could not identify them. He also stated that after he was shot in the leg he took off running to his friend's house. He says it took him about five minutes to get there and his friend

immediately called 9-1-1. That call came in at 12:24 a.m., which would indicate the shooting was at roughly 12:19 a.m.

Special Agent Williams presented geolocation data for Defendant related to the Monroe Street shooting. Based on an approximate shooting time of 12:23 a.m., Defendant's phone usage between 12:21 and 12:24 a.m. placed him somewhere within a large area of North Alexandria which also included the location of the shooting at the intersection of Florence Avenue and Monroe Street. Williams, however, provided no evidence as to where Defendant's phone was located immediately prior to this three-minute window, and could not pinpoint where in the general highlighted area Defendant's phone was actually located. The area serviced by the tower Defendant's phone used during this timeframe covers most of the area between N. MacArthur Drive and Interstate 49 that is north of Jackson Street and extends east past I-49 to some extent.

State's Exhibit 13, a photo of Chris Newell's vehicle, shows a Honda Accord with no tint on any of the windows, much less any torn tint on the passenger side of the car. Given the discrepancy between Defendant's description of how many people were in the car and White's certainty there were four people in the car, as well as the failure of Newell's vehicle to actually match the detailed description of the car given by White, added to the inaccurate timeframe given for the shooting by Defendant, no rational jury could have found beyond a reasonable doubt the State met its burden of excluding "every reasonable hypothesis of innocence." Defendant's conviction and sentence for the attempted second degree murder of Daryl White should be vacated.

*Ninth Street Shooting*

13

In his recorded statement to police, Defendant stated he was driving down "Broadway," and:

> We passed up Peabody. Alright we passed up Ed Payne's store and we made a right on Sixth Street. When we made a right on Sixth Street and made it to the fork, to the fork in the road. Alright then …then Mike was like hold on, hold on, hold on before we made it down the street.

Defendant's stated route would have been going north on Broadway Avenue.[4] Payne's Grocery is on Broadway Avenue between Seventh and Sixth Street. Taking a right onto Sixth Street would have led them down to a fork in the road where Sixth and Seventh Street merge. Solomon Street, where Defendant claims he made a complete stop before Dotson jumped out of the car, dead ends onto Sixth Street immediately before the fork. While this testimony provides a very detailed description of the shooting, there is one major flaw: *Peterson was on Ninth Street, not Sixth Street, when the shooting took place.* Although the State's brief to this court does nothing to address the fact that the shooting happened on Ninth Street, and both Defendant's statement and Guillot's testimony specifically talk about Sixth Street without a single mention of Ninth Street, they argued during their closing that confusing two numbered streets is an easy mistake to make. That, however, ignores the fact that: 1) Defendant actually lived on Sixth Street; 2) his detailed description of their route is completely accurate aside from claiming the shooting was on Sixth Street; and 3) Guillot specifically noted he was familiar with the city of Alexandria, having lived there his entire life.

---

[4] Defendant's described route can be traced on Google Maps and the validity of that information can be accomplished using the City of Alexandria's website at parksandrec.cityofalexandriala.com. Although there are multiple maps included as exhibits, they lack relevant street names. State's Exhibit 27 was an enlarged map which may have included the street names, however, that exhibit was not submitted with the record. Accordingly, Google Maps was used to verify the street names for the streets shown on the included exhibits.

At 12:49 a.m. on September 28, 2011, the RCPD received a call from Marion Peterson (Peterson) *reporting someone shot at him on Ninth Street.* Peterson told law enforcement at the time of the shooting he saw a vehicle swerving in the road, it tried to hit him, then the car stopped, the passenger jumped out, swore at him, and then shot at him twice. He further testified that despite telling two separate officers on the night of the shooting that the vehicle was a dark blue, four-door Nissan with tinted windows, he is not sure if that description is accurate. He also said he had been drinking at the time. Thus, his testimony is somewhat suspect under *State v. Hypolite*, 14-1658 (La.App. 3 Cir. 6/1/05), 903 So.2d 1275. Peterson could not say with certainty whether or not Newell's vehicle was the car from which shots were fired at him. He also stated it took him about ten minutes to compose himself before he called RCPD, thus placing the shooting at roughly 12:40 a.m.

Despite Peterson's testimony that the shooting took place at about 12:40 a.m., Special Agent Williams's analysis of Defendant's cellphone lists an approximate shooting time of 12:52 a.m., and the earliest activity on the map is a text message at 12:45 a.m., roughly five minutes after the actual shooting. Additionally, according to the map produced by Williams for trial, *none of the activity charted places Defendant in an area that includes the location where the shooting took place.*

Guillot testified that while he was in a holding cell shortly after being arrested at 8:30 p.m. on September 28, 2011, he heard Defendant tell another individual he shot at someone on Sixth Street. This testimony is alleged to have happened in a holding cell during a period of time when Defendant was demonstrably not in the same holding cell, and contains details that do not relate to

15

the shooting on Ninth Street. *None of the evidence presented to the jury actually places Defendant on Ninth Street when some unknown person shot at Peterson.* Even when viewed in the light most favorable to the prosecution, no rational jury could have found beyond a reasonable doubt that the State met its burden of excluding "every reasonable hypothesis of innocence." Defendant's conviction and sentence for the attempted second degree murder of Marion Peterson should be vacated.

*This is a circumstantial evidence case.*

With regard to the three shootings, Defendant argues the State's case against him rested solely on his own admission of being present at the crimes, expert testimony from an FBI Special Agent regarding the general location of his cell-phone around the times of the shootings, and the statement of a witness who claimed to have seen Defendant with a gun after the shootings as well as having overheard Defendant admit to shooting at someone. He argues both of these forms of evidence are circumstantial evidence, and thus, under La.R.S. 15:438, the State must exclude every reasonable hypothesis of innocence in order to obtain a conviction. I believe Defendant is correct in his assertion that the State's entire case, at least with regard to the three shootings, is built upon circumstantial evidence. I believe the majority errs in applying a standard of review applicable to a case in which there is both direct and circumstantial evidence. Despite the State's argument before the trial court that Defendant's statement is direct evidence, under Louisiana jurisprudence the statement was circumstantial evidence. The state supreme court has explained:

> Generally, direct evidence consists of testimony from a witness who actually saw or heard an occurrence, proof of the existence of which is at issue; *whereas circumstantial evidence consists of*

16

*collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. . . .* **Where an essential element of the crime is not proven by direct evidence, La.R.S. 15:438 applies. That rule restrains the fact finder, as well as the reviewer on appeal, to accept as proven all that the evidence tends to prove and then to convict only if every reasonable hypothesis of innocence is excluded.**

*State v. Lilly*, 468 So.2d 1154, 1158 (La.1985) (emphasis added).

There is a difference between a confession, which is direct evidence, and an admission, which is circumstantial evidence. While the State argues Defendant's statement is direct evidence, the statement is an admission, not a confession. "The term 'admission' is applied to those matters of fact which do not involve criminal intent; the term 'confession' is applied only to an admission of guilt, not to an acknowledgment of facts merely tending to establish guilt." *State v. Jones*, 451 So.2d 35, 40 (La.App. 2 Cir.), *writ denied*, 456 So.2d 171 (La.1984). Defendant's statement does not involve criminal intent. Although he admits to being in the car while the shootings were happening, he clearly states that someone else, Michael Dotson (Dotson) was doing the shooting. Defendant was not even aware that Dotson was shooting at people, believing he was simply shooting the gun in the air.

The State then is left with Daniel Guillot's (Guillot) testimony that he allegedly overheard Defendant tell someone else he "busted somebody on Sixth" street. There are two problems with relying on Guillot's statement: (1) the circumstances under which he claims the statement happened are demonstrably false in the record, and (2) **no one was actually shot on Sixth Street**. Guillot vehemently testified he was put in the holding tank between 8:30 and 9:00 p.m., and that he overheard Defendant tell another inmate he shot at someone on Sixth

17

Street about thirty to forty-five minutes later. Sergeant DiStafano started interviewing Defendant at 8:30 p.m. that day, and Defendant was in an interview room with officers until after he gave his statement, which was recorded at 11:11 p.m. It was physically impossible for the conversation Guillot was adamant happened between 9:00 and 10:00 p.m. in the holding area to have occurred at that time. But, even setting aside the fact that the conversation could not have taken place the way Guillot described it, the statement was at best circumstantial in relation to the three shootings that actually occurred on September 27 and 28, 2011. The alleged statement contained few relevant facts and does not match other known evidence presented at trial. In *Jones*, the second circuit found that a defendant's statement he shot someone with a gun which he threw into the river was an admission, as it did not involve intent nor did it state "the victim's name, the purpose of the shooting, where the shooting occurred, or any other event relating to the shooting." 451 So.2d at 40. Similarly, the statement Guillot claims to have overheard does not involve intent, and while Guillot testified that it did include the location of the shooting, *the location is not a location where an actual shooting took place.* Additionally, even if this court accepted the State's claims that Defendant simply confused Sixth Street and Ninth Street, the statement still would not be direct evidence with respect to the Texas Avenue or Monroe Street shootings.

*Error in jury instructions.*

In his argument to this court regarding sufficiency of the evidence, Defendant asserted the case was based purely on circumstantial evidence and the jury should therefore have been informed that under La.R.S. 15:438, the State was required to "exclude every reasonable hypothesis of innocence." Additionally, he

18

noted Defense counsel at trial twice requested that the jury be informed of this requirement. As noted previously, the trial court incorrectly denied that request on the grounds that Defendant's admission and Guillot's testimony amounted to direct evidence. Although this error was not raised as an assignment of error, "Louisiana courts have recognized certain rights are so basic and 'due process' requirements mandate that they may be asserted for the first time on appeal or noticed as an error patent by mere inspection of the pleadings and proceedings." *State v. Pyke*, 93-1506, p. 3 (La.App. 3 Cir. 5/4/94), 640 So.2d 460, 462. Accordingly, this court may review this error of law despite it not being set out as an assigned error.

In *State v. Porter*, 626 So.2d 476 (La.App. 3 Cir. 1993), this court reversed a conviction for attempted second degree murder due to an erroneous jury instruction, noting that the issue was a due process violation that should be dealt with on appeal, despite trial counsel's failure to object, rather than later post-conviction relief "in the interest of fundamental fairness and judicial economy." 626 So.2d at 479. The trial court deprived Defendant of his right to due process by denying Defendant's request to instruct the jury that where the State's entire case is based on circumstantial evidence, the evidence "must exclude every reasonable hypothesis of innocence,". *See* La.R.S. 15:438. The state supreme court has repeatedly held jury instructions must be considered as a whole. Nothing in the jury charge here would inform the jury of the State's burden on circumstantial evidence. The trial court did not mention direct evidence in its jury instructions, and gave the following instruction on circumstantial evidence[5]:

---

[5] It is not clear from the record what the source of this instruction is. It does not address the distinction between direct and circumstantial evidence. The suggested jury instruction for "Direct and circumstantial evidence" in the Louisiana Civil Law Treatise is simply:

19

. . . circumstantial evidence is [sic] facts or circumstances from which one might infer or conclude according to reason and common experience the existence of other connected facts. Further, circumstantial evidence is that where the main fact can be inferred when using reason and common sense from proof of collateral facts and circumstances. Circumstantial evidence further involves, in addition to the assertion of witnesses as to what they have observed, a process of reasoning or inference by which a conclusion was drawn. The gist of circumstantial evidence and the key to it is the inference or process of reason by which the conclusion is reached. This must be based on the evidence given together with the sufficient background of human experience to justify the conclusion.

Not only was the jury not informed that the State's circumstantial evidence "must exclude every reasonable hypothesis of innocence," they were not informed of the definition of direct evidence, or of the distinction between the two. *See* La.R.S. 15:438. Accordingly, Defendant's convictions with respect to the shootings should be reversed due to improper jury instruction. Under the holding in *Porter*, these charges should be remanded to the trial court for a new trial, as the reversal would be based not on evidentiary insufficiency but rather trial court error. 626 So.2d at 47.

*Possession of a firearm by a convicted felon.*

I agree with the majority's finding that Defendant's conviction for possession of a firearm by a convicted felon, in violation of La.R.S. 14:95.1, and his sentence therefor, should stand. In order to convict Defendant, the State needed only to prove Defendant was a convicted felon and he in fact possessed a firearm. *See State v. Mose*, 412 So.2d 584 (La.1982). During trial, Defendant and

---

Evidence is either direct or circumstantial. Direct evidence is evidence which, if believed, proves a fact. Circumstantial or indirect evidence is evidence which, if believed, proves a fact and from that fact you may logically and reasonably conclude that another fact exists.

You cannot find a defendant guilty solely on circumstantial evidence unless the facts proven by the evidence exclude every reasonable hypothesis of innocence.

20

the State entered a joint stipulation that Defendant had a prior felony conviction for Possession of CDS II. Additionally, Guillot testified he saw Defendant around 1:30 a.m. on September 28, 2011, with a silver and black gun in his waistband. Unlike Guillot's testimony regarding the other offenses, his testimony regarding the gun is not contradicted by concrete physical facts. Viewing this evidence in the light most favorable to the prosecution, a rational jury could have found Defendant guilty beyond a reasonable doubt as to this offense.

For these reasons set forth *in extenso* I respectfully dissent from the majority's affirmance of Defendant's conviction for the three shootings. The convictions based on the three shootings should be reversed and the case remanded for a new trial.